UNION TRUST CO. OF N. Y. *v.* MISSOURI, K. & T. RY. CO. and others. (Original Bill.)

MISSOURI, K. & T. RY. CO. *v.* UNION TRUST CO. OF N. Y.   (Cross-Bill.)

*(Circuit Court, D. Kansas.* November Term, 1880.)

1. RAILROAD MORTGAGE—SURRENDER OF ROAD TO COMPANY—TENDER OF INTEREST DUE.

   The trustee in the mortgage of a railway company, which was in default in respect of interest on bonds, the principal of which did not mature for many years to come, having, as mortgagee, entered into possession of the railroad, was, on being tendered and paid the amount of past-due interest, decreed to surrender the possession of the road to the railway company.

2. SAME—MORTGAGES CONSTRUED.

   Article 12 of the mortgage or deed of trust of the Missouri, Kansas & Texas Railway Company to the Union Trust Company, trustee, of February 1, 1871, and article 13 of the same mortgage, construed. Article 12 was held to give the trust company power to enter and hold possession only in case there has been a default in the payment of interest, and a majority of the bondholders had elected to have the whole sum secured by the mortgage to become due. Article 13 was held to give the trustee power to enter and hold possession of the road only in case of default in the payment of interest, followed by a written demand of the holders of at least 1,000 bonds to foreclose the mortgage.

**3. SAME—AGREEMENT TO PREVENT NECESSITY OF FORECLOSURE.**

The railway company, being embarrassed, made on the first of March, 1876, a contract with its bondholders, whereby the Union Trust Company, as mortgage trustee, was let into the possession and operation of the road, under the further agreement that the first mortgage bondholders would accept 4 per cent. interest instead of 7 per cent. for the years 1876, 1877, 1878, and 5 per cent. interest instead of 7 for the years 1879, 1880, and 1881. In the event of earnings over the amount necessary to pay this *reduced* rate of interest, the agreement provided that such excess should be used in the payment of interest on the second mortgage income bonds. At the end of four years the company tendered the full amount of all interest on the first mortgage bonds then in arrears, and demanded the possession of the road. *Held*, construing the agreement of March 1, 1876, that that agreement was made for the benefit and protection of the railway company, to prevent the necessity of a foreclosure, and that the railway company, on the payment of all· interest in arrears, at the full rate, was entitled to the possession of its property, although the six years contemplated by the March agreement had not elapsed; and that the income bondholders had no right to insist on the property remaining for two years more in the hands of the trust company.

On the first of February, 1871, the railway company executed a first mortgage to the Union Trust Company of New York, as trustee, to secure bonds, amounting to more than $14,000,000, drawing 7 per cent. interest. In 1874, the company made default in the payment of interest, and a receiver was appointed under a second mortgage. In 1875, the trust company filed a bill to foreclose the said mortgage of February 1, 1871; the receiver continuing in possession. On March 1, 1876, the first mortgage bondholders, as parties of the first part; the second mortgage bondholders and all other creditors, parties of the second part; the Missouri, Kansas & Texas Railway Company, party of the third part; and the Union Trust Company as party of the fourth part,—entered into an agreement known as the "March agreement."

Briefly stated, that agreement having recited that the railway company is unable at present to pay its existing indebtedness, etc., provides that the first mortgage bondholders will accept 4 per cent. interest for the years 1876, 1877, and 1878, and 5 per cent. interest for the years 1879, 1880, and 1881, to be paid semi-annually on the days mentioned in the bond, to-wit, February and August 1 of each year; and the said first mortgage bondholders agreed that, for all past-due interest, and the difference between the reduced rate and the mortgage rate, as it became due, they would accept income bonds under an income mortgage to be made and dated April 1, 1876, at 80 cents on the dollar; the said income bond to draw interest at the rate of 6 per cent., payable semi-annually, from the net or surplus earnings of the railway company. Bill, Schedule A, 14, 15. The floating debt creditors and the holders of the second mortgage bonds, under the original second mortgage of September 1, 1873, who held first mortgage bonds as collateral security, were authorized to retain said first mortgage bonds, and credit them upon their indebtedness at 65 cents on the dollar, flat. For the balance, after crediting these collaterals, they were to receive income bonds under the in-

come mortgage, at 80 per cent. of their par value.   Bill, Schedule A, 17, 18.   The persons holding preferred stock, issued under the agreement of April 27, 1874, were to receive income bonds therefor.

The third article of the said agreement provides how said net surplus earnings should be applied.   Adjustments were to be made semi-annually, as each coupon upon the first mortgage bonds became due. The net or surplus earnings were to be applied—*First*, to the payment of the interest on the first mortgage bonds at the reduced rate; *second*, any excess, to the payment of the interest on incomes; *third*, any excess beyond this, to be applied towards increasing the payment of the interest on the first mortgage bonds up to the mortgage rate; *fourth*, if there is no excess of the net earnings over the reduced rate, the first mortgage bondholders were to take, semi-annually, income bonds for the balance at 80 cents on the dollar; *fifth*, if there should be no net earnings applicable to the income bonds, they were to accept, semi-annually, interest-bearing scrip, which it was provided was to be redeemed, with 6 per cent. interest, before any dividend could be declared upon the stock.

On April 1, 1876, the income mortgage was executed, pursuant to that agreement.   This is strictly an income mortgage, whereof the principal is due in the year A. D. 1911; and it provides that, from the net or surplus earnings of the said railway company the interest thereon shall be paid semi-annually, at the rate of 6 per cent. per annum, on the first days of April and October in each year.

Article 3 of said income mortgage provides that the railway company, after it shall have received its property, "shall thereafter pay, from its net or surplus earnings remaining after the payment of the expenses of operating and keeping in repair its railway and property herein described, and the interest of the several incumbrances prior hereto, the interest on the said bonds, semi-annually, at the rate of 6 per cent. per annum, on the first days of April and October of each year.   If the said net or surplus earnings, so remaining as aforesaid, shall not be sufficient to pay the interest of the said bonds as the same becomes due and payable, the said railway company shall issue to the holder of the coupons or interest warrants of the said bonds scrip certificates, payable only from the net or surplus earnings of the railway company, which, with the interest thereon, at the rate of 6 per cent. per annum, shall be redeemed and paid by the railway company before it declare or pay any dividend on the capital stock."

The sixth article of the income mortgage, which is the one which contains the company's covenant, and the only one referred to in the scrip as the authority under which the scrip is issued, is as follows:

"Art. 6. The said party of the first part [railway company] hereby further agrees that it will pay, or cause to be paid, the said bonds to be issued and secured by this mortgage as aforesaid, and that it will pay the interest thereon semi-annually, in lawful money, from its net or surplus earnings remaining

after the payment of the expenses of operating and keeping in repair its railway and property herein described, and of the interest on the several incumbrances prior thereto and hereinbefore described, provided said net or surplus earnings shall be sufficient therefor, and that in case its said earnings in any six months shall be insufficient therefor, then, for any such deficit, said party of the first part agrees to issue a scrip certificate, redeemable, with six per cent. interest, before any dividend shall be declared upon the stock of said company, [which follows, in this respect, the language of article 3 of the March agreement.] Said party of the first part further agrees to pay all taxes, levies, and assessments imposed and assessed, and which may hereafter be imposed or assessed, upon the premises, franchises, and property hereby conveyed, or intended so to be, and also the United States government tax upon the interest payable on said bonds, and each of them, and that it will, at its own expense, do or cause to be done all things necessary to preserve and keep valid and intact the lien and incumbrance hereby created."

Under certain orders of court and the March agreement, the receiver surrendered to the trust company, and that company took possession of, the railway, July 1, 1876, and remained and was in possession in November, 1880, when the tender below mentioned was made.

Under the operation of the agreement of March 1, 1876, and the corresponding provisions of the income mortgage of April 1, 1876, the interest up to December 1, 1880, on the first mortgage bonds, at the reduced rate, had been paid in full, but not promptly, in cash, out of earnings, except the coupon which fell due February 1, 1880, and the one which fell due on August 1, 1880. The difference between the reduced rate and the mortgage rate during this period had, pursuant to said agreement and mortgage, been settled for each six months by the issue and delivery of income bonds therefor. There being no earnings reported by the trust company as applicable to the payment of interest on the income bonds, this interest had every six months been settled by the issue of the company's interest-bearing scrip.

The eleventh article of the March agreement provided that "whenever the net proceeds of the business of the road shall be sufficient, pursuant to the foregoing provisions, to pay the first mortgage coupons in full, and whenever such payment in full shall have been made in succession, it shall be the duty of the trust company to settle its accounts with the railway company, and deliver to the railway company all and singular the money and property so held by it in trust." The twelfth and thirteenth articles of the first mortgage of February 1, 1876, construed by the court, are sufficiently stated in the opinion.

In November, 1880, the railway company tendered to the trust company the full amount of all past-due interest on the first mortgage bonds, and demanded the possession of its property. The trust company refused to accept it, and filed a bill in the United States circuit court for the district of Kansas, making the railway company, and representatives of its mortgage bondholders, defendants, setting out *in extenso* the different mortgages and the said March agree-

ment, and claiming, among other things, that it was entitled to keep in possession, under the terms of the mortgage of February 1, 1871, and of the said March agreement. This is the original bill above entitled.

The railway company appeared and answered; and also filed a cross-bill against the trust company, alleging the mortgages, the March agreement, and the tender, which it offered to keep good, and praying that in case it should keep the tender good, and make payment of all arrears of interest on the first mortgage bonds, that the trust company be decreed to deliver to it its road and property. A decree was entered, ordering and adjudging that, upon settlement of the accounts between the trust company and the railway company, under and pursuant to the eleventh article of the agreement of March 1, 1876, and upon payment in full of all interest on the first mortgage bonds secured by the mortgage of February 1, 1871, the trustee be ordered to deliver the road and property to the railway company.

The statutes of Kansas (Comp. Laws 1862, p. 149) provided that all mortgages or deeds of trust to secure the payment of money shall be foreclosed in court, and not by sale out of court; also provided (Comp. Laws 1862, p. 68, "Mortgages") that, in the absence of stipulation to the contrary, the mortgagor of real property may retain the possession thereof. These statutes were cited on the argument, although not referred to, and apparently considered immaterial, in the opinion of the court.

*John F. Dillon*, for defendant.

*Wheeler H. Peckham*, for plaintiff.

*Charles E. Whitehead*, for the Amsterdam syndicate of bondholders.

MILLER, Justice. This bill is brought by the trust company, a citizen of New York, in the circuit court of the United States for the district of Kansas, against the railway company, a citizen of the United States, and others. The primary object of the bill is to obtain the direction of the court in regard to the performance of the duties of complainant, as trustee, under circumstances mentioned in the bill, and it comes before me on the bill, the answer, and cross-bill of the defendant company, and certain exhibits and affidavits.

I have not the time to write out in full the reasons governing my decision, and in what I have to say must refer to instruments whose construction controls my action, without copying them, or even the material parts of them.

The Union Trust Company is in possession of the road of the railway company, as trustee under two mortgages, and an agreement in writing concerning that possession, (the agreement of March, 1876.) The possession was delivered under the written agreement and on order of the court in the year 1876, and the road, its finances, and all its affairs have been managed by the trust company ever since. The reason for placing the possession of the road in the hands of the trust company was its failure to pay the interest on the mortgages

of the railway company, in which event those mortgages contained a provision for such transfer of possession. In the actual event, however, the agreement already mentioned as to the nature and duration of the possession so transferred, and the duties and powers of the trust company while in possession, was the more immediate arrangement under which the trust company took charge of the road.

The main purpose of the control and possession of this long line of railroad, extending many hundred miles through several states and the Indian Territory, being placed in the trust company, was to secure the payment of the debts of the company, and especially of the first mortgage bonds, in regard to which the trust company was the trustee. The railway company, which was then much in debt, and had for some time failed to pay its interest, now comes forward and tenders all that is due and unpaid on any of its funded debt, alleges its ability in future to meet all its obligations as they mature, and demands to be restored to the possession and control of its property. If there exists no special reason to the contrary, this would seem to be a reasonable demand, for the principal of the bonds for which the trust company is trustee is not due for more than 20 years, and if the railroad company is ready to pay all the interest that is due, and is in condition to meet its future installments, it is difficult to see why its property should be kept out of its control, and in the hands of another corporation, for these 20 years.

The points raised by the trust company are (1) that the provision of the first mortgage, under which they hold, requires this; and (2) that the written agreement, (of March 1, 1876,) under which they took possession, requires that they should at least hold it for the present.

The mortgage or deed of trust contains two distinct provisions as to the power of the trust company, in case of default of payment by the railroad company, found in articles 12 and 13 of the conditions of the instrument. Article 12 begins as follows:

"In case default shall be made in payment of any interest upon either of said bonds when the same becomes due and payable, or in payment of any sum or sums of money hereinbefore provided to be made for the creation of said sinking fund, and such default shall continue for six months after the same has been demanded, the whole principal sums mentioned in each and all of said bonds then outstanding shall, at the option of holders of a majority in interest of said bonds, become forthwith due and payable; and in such case it shall be lawful for said party of the second part, [the trust company,] its successor or successors, to enter upon all and singular the railroads, property, and premises hereby conveyed, or intended to be conveyed, and to have, hold, use, and operate the same, until the same shall have been sold or otherwise disposed of," etc.

The provision as to what the trustees may then do is very full, and the power conferred very great.

But, without elaborating the matter, I am of opinion that the words "in such case," referring to a state of case in which the power of

entry and possession depends, mean the case in which there has been a default in the payment, and on the declaration by the majority of the bondholders that the whole of the sums secured by the bonds and the mortgage has become due, according to the option, the holders have to do so. Then, and not till then, do all these extraordinary powers in the trustee begin, and the remedy for a mere default in paying interest is found in section 13. It is as follows: "In case default be so made and continued as aforesaid, that is, for six months after demand, the party of the second part, its successor or successors in trust, may also, and upon the written request of the holders of at least one thousand of such bonds then outstanding, amounting to one millions of ,dollars, shall foreclose this mortgage by legal proceedings," or sell or cause it to be sold at auction in the city of New York, etc. Both these sections contain specific directions for the execution of the powers which they confer; but these powers arise, under the first clause, when there is a default, and a majority of the bondholders declare the whole debt due; and, under the second clause, when there is a default, and the holders of a thousand bonds of a million of dollars in amount may demand foreclosure in court, or by sale of the trustee at public auction in the city of New York.

Neither of these events has occurred. There has been no exercise, or attempt to exercise, the option of declaring all the bonds to be due, nor has there been any demand by any of the bondholders or the trustee to foreclose the mortgage by either of the modes mentioned. I can see no right, under this mortgage, in the trust company to take or to hold possession of the road.

As regards the agreement of the parties (of March 1, 1876) under which the actual possession was taken, I cannot recite it here. *It was made plainly for the benefit of the railroad company, to prevent the necessity of a foreclosure of the mortgage* by either of the modes pointed out in the instrument, and the period of six years, to which the possession was limited, was intended to give the company that much time to retrieve its condition, and resume payment of its interest. During this time the road was to remain under the control of the trust company, and no foreclosure was to be had if the company's revenue could pay the reduced rate of interest. If this could not be done, or if, at the end of six years, the railroad company could not resume them, and maintain the future payments of its interest installments, the parties were remitted to their rights under the original mortgage.

The business of the road has been so conducted that, with the aid of the increase of general prosperity, all the secondary or subsidiary mortgages and claims against the company have been paid or arranged, so that nothing is due and unpaid except parts of the two last installments of interest on the first mortgage bonds. There is in the hands of the trust company a large sum of money (say $300,-000) applicable to this payment, and the company, being now pros-

perous, offers to pay and tenders the balance. Must the trust company keep the possession for two years longer, under these circumstances, or should they accept the money, pay off the coupons, and return the road to the possession of the owners? I think that the condition being for the benefit of the railroad company, it can waive the remaining two years of the agreement, and, when all that is due is paid, they are entitled to the possession of their property.

It is suggested that the trust company owes a duty to what is called the second or income bondholders, which requires them to hold the possession. But that instrument has no provision for possession of the road until default, and there has been none here. It only covers the net income, after payment of the expenses and interest on prior mortgages, and its only remedy is that no dividend can be declared until the interest on it is regularly paid. I can see no right of the trust company to hold for these bonds.

It is also said that there is no such security that the railroad company will be able to continue the future payment of its interest as the agreement contemplates. I am of the opinion that in this counsel is mistaken; that the admitted facts, with the written instructions of the advisory board, which was organized under the agreement for the purpose of advising in just such case as this, are sufficient warrant for a surrender of the property.

Let a decree be drawn in accordance with this opinion.